UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

CENTURY VERTICAL SYSTEMS, INC., d/b/a
PRO Elevator Services

                  **ORDER**

            Plaintiff,

                  07-cv-2044 (KAM)

    -against-

LOCAL No. 1, INTERNATIONAL UNION OF
ELEVATOR CONSTRUCTORS,

            Defendant.     X

----------------------------------------

**MATSUMOTO, United States District Judge:**

      Plaintiff Century Vertical Systems, Inc., d/b/a PRO Elevator[1] ("Vertical") commenced this action against defendant Local No. 1, International Union of Elevator Constructors to enjoin arbitration with the defendant concerning plaintiff's alleged failure to comply with a collective bargaining agreement. Pending before the court are the parties' cross-motions for summary judgment on the issue of whether plaintiff is bound to arbitrate. For the reasons that follow, plaintiff's motion is denied and defendant's motion is granted.

---

[1] Although the case caption indicates that plaintiff's d/b/a name is "PRO Elevator Services," the certificate of incorporation and testimony establish that Vertical's d/b/a is "PRO Elevator."

## I. BACKGROUND

Plaintiff Vertical is a company engaged in the business of maintenance and modernization of elevators. (Dorsey Dep. at 6-8, 10-11, 34-36.) Vertical is owned by Richard Dorsey and Todd Rowan. (Dorsey Dep. at 23; Rowan Dep. at 14.) Defendant, Local No. 1, International Union of Elevator Constructors ("Local 1"), is a labor organization representing elevator mechanics and apprentices who install, construct, repair, service, maintain, and operate elevators and other forms of vertical transportation in the Greater New York City area. (Stork Aff. ¶ 2.)

Dorsey, a fifty-percent owner of Vertical, was previously employed by Century Industrial Services, d/b/a PRO Elevator Services, Inc. ("Industrial"), owned by Michael O'Connor. (Dorsey Dep. at 6-7.) Industrial was incorporated in March 1999 and engaged in the business of elevator maintenance, repair and construction in the New York City area. (Id. at 10-11.) Industrial's business address was 171 West Street, Brooklyn, NY 11222, and its mailing address was P.O. Box 907, Jefferson Valley, NY 10535. (Id. at 12.) Industrial's phone number was (718) 389-3970. (Id. at 13.)

At the start of Dorsey's employment with Industrial in January 2002, he joined Local 1 at the request of Mr. O'Connor,

2

and paid an initiation fee and dues to the Union. At that time, Dorsey was the only employee of Industrial and had the role of a "mechanic, a manager and a salesman." Industrial had "a few chain blocks and a few chain falls," but "the tools that were brought into the company were [Dorsey's] personal tools and [] rigging." (Id. at 12.) The van used by Dorsey to service customers was owned by Industrial. (Id. at 12.) Dorsey remained in his role as "general mechanic" through the length of his employment at Industrial. (Id. at 7, 8.) Dorsey participated in soliciting customers with Mr. O'Connor and finalized contracts with customers. (Id. at 7, 8.)

Additional employees were hired by Industrial beginning in approximately April 2002. (Id. at 9.) Todd Rowan, a fifty-percent owner of Vertical, began his employment with Industrial in May 2002. (Rowan Dep. at 6.) As new employees were hired, they joined Local 1. In performing work for Industrial, employees used their personal tools. (Dorsey Dep. at 22-23.) Some of the Industrial employees used Industrial's vehicles, and others used their own. (Id. at 12.)

On March 9, 2005 Michael O'Connor, in his capacity as President of Industrial, signed a "Joinder Agreement" for the employer, "PRO Elevator," with Local 1, whereby the parties agreed to adopt and be bound by the terms of a January 2, 2002 collective bargaining agreement between Local 1 and ThyssenKrupp

3

Elevator Corporation.  (Marcus Aff. Ex. C.)  Robert Stork, a vice-president and business agent of Local 1, subsequently received complaints from Industrial's workers that "expenses, vacations and [] worked hours weren't being paid properly."  (Stork Dep. at 8.)  In response to these complaints, Stork contacted "the first contact point," Dorsey, to discuss alleged violations of the collective bargaining agreement.  (Id. at 8.)  After speaking with Dorsey, Stork attempted to resolve these problems by speaking to O'Connor.  (Id. at 8-9.)  Additionally, Stork addressed "basic average discipline problem[s]" regarding some of the employees that were brought to Stork's attention by Dorsey.  (Id. at 13-15.)  In addition to Dorsey and O'Connor, Stork testified that he also dealt with a "gentleman who was in charge of payroll."  (Id. at 16-17.)

As a result of the violations of the CBA, the parties entered into a settlement agreement.  (Id. at 27.)  However, Industrial failed to comply with the terms of the agreement and Local 1 withdrew manpower[2] from Industrial on approximately January 26, 2006 (Id. at 28-30) and eighteen of Industrial's twenty-two workers ceased work.  Prior to this withdrawal, Dorsey had "ongoing conversation[s]" with O'Connor about O'Connor's failure to make contribution payments pursuant to the

---

[2]   The parties dispute whether this was a strike; however, the characterization of the workers' collective action is immaterial to the pending motions.

4

CBA and attempted to persuade him to make such payments. (Dorsey Dep. at 16-17.) Dorsey was one of the four employees who did not cease work on January 26, 2006 because "there was an elevator company to run," and he "was a supervisor." (Id. at 17-18.) The other three employees who did not stop work were Rowan, who was a foreman, and Dorsey's brothers, Scott and Tom, who were field workers. (Id. at 18.)

Dorsey, Rowan, and the two other employees continued to "answer[] service calls and elevator shutdowns," and "still [are] doing it to date." (Id.) O'Connor "said he didn't want any part of the business and said [they] could do what [they] wanted with it." (Id. at 20.) As a result, Dorsey and Rowan formed the plaintiff corporation – Century Vertical Systems. (Id. at 20-21.) In March 2006, they filed for an assumed name, PRO Elevator (Id. at 21), dropping the word "Services" previously included when the corporation's name was Century Industrial Services, and continued doing business as PRO Elevator.

The newly-formed Vertical remained at the same location as Industrial and kept the same phone number. (Id.) Dorsey contacted Industrial's existing customers about Vertical providing services pursuant to the customers' contracts with Industrial. (Id. at 22-23.) Currently, approximately seventy percent of PRO Elevator's customers were previously serviced by

5

PRO Elevator Services.  (Id. at 34.)  Dorsey, Rowan, and Dorsey's brothers used their own personal tools – the same tools used as employees of Industrial – in their work as Vertical employees. (Id. at 24.)  In addition to these employees, James Drummond, a former Industrial employee, began working for Vertical one week after O'Connor gave up the business, and John Drummond, also a former Industrial employee, joined a month later along with a maintenance mechanic.  (Id. at 25.)  Since then, Vertical has gradually expanded its workforce to include eighteen employees, fourteen of whom are mechanics or apprentices.  (Id. at 31.)  In September 2006, Industrial filed a petition for bankruptcy.

In March 2007, Local 1 made a demand for arbitration to resolve a dispute concerning the failure of Vertical to pay wage rates and fringe benefit contributions to various employee plans, as required by the CBA, and its failure to maintain the union security provisions of the CBA. Vertical subsequently filed the pending lawsuit seeking to enjoin the arbitration.

## II.  DISCUSSION

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also National Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."); Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion.").

Nor can the nonmoving party rest only on the pleadings. Celotex, 477 U.S. at 324 (Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings");

7

Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Instead, each statement of material fact by the movant or opponent must be followed by citations to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 447 U.S. at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Id. at 249-50 (internal citations omitted).

### A. Agreement to Arbitrate

"[C]ourts are entrusted with the threshold determination whether a dispute is subject to arbitration under an assertedly applicable agreement to arbitrate." Stotter Div of Graduate Plastics Co. v. District 65, UAW, 991 F.2d 997, 1000 (2d Cir. 1993); see also Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964), affirming Livingston v. Wiley & Sons, Inc., 313 F.2d 52 (2d Cir. 1963). A party to a collective bargaining agreement containing an arbitration clause is bound by the terms of the agreement during its lifetime and national

8

labor policy requires that doubts about whether a particular dispute should be subject to arbitration "be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583 (1960).

The CBA that contains the arbitration clause at issue here was adopted by a joinder agreement between Local 1 and Industrial, d/b/a PRO Elevator Services, Inc. The agreement contains Michael O'Connor's signature in the capacity of owner/operator for "PRO Elevator," as employer, and Ray Hernandez's signature as President-Business Manager of Local 1. (Marcus Dec. Ex. C.) Vertical argues that it was not a party to the joinder agreement, and, therefore, not bound by its terms, including the CBA's arbitration clause. (Pl. Mot. at 8-9.) Local 1 contends that Vertical was a signatory and party to the March 9, 2005 joinder agreement, and is therefore required to arbitrate disputes arising under the CBA. (Def. Resp. at 6-7.) The court notes that the joinder agreement is signed by "PRO Elevator," as employer, and the plaintiff's d/b/a is the same. Nevertheless, the court need not resolve the issue of whether Vertical should be considered a signatory to the joinder agreement because "although the duty to arbitrate . . . must be founded on a contract, the impressive policy considerations favoring arbitration are not wholly overborne by the fact that

[plaintiff] did not sign the contract being construed." Wiley & Sons, 376 U.S. at 550.

### B. Successor to an Arbitration Agreement

Even assuming that Vertical was not a party to the CBA, it may have assumed the agreement by PRO Elevator Services, Inc., to arbitrate by implication. In the context of collective bargaining agreements, a corporation that succeeds to the business of another may be required to arbitrate under a contract to which only the predecessor was a party. Wiley & Sons, Inc., 376 U.S. at 550 (1964); Farrington & Favia, Inc. v. New York Typographical Union, 359 F. Supp. 2d 327, 329 (S.D.N.Y. 2005). Although the law governing ordinary contracts would not bind a non-consenting successor to a contracting party, "a collective bargaining agreement is not an ordinary contract. . . . It is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law – the common law of a particular industry or of a particular plant." Wiley & Sons, Inc., 376 U.S at 550 (internal quotations omitted). The preference of national labor policy for arbitration balances the "rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers," with

"protection [of] employees from a sudden change in the employment relationship." Id. at 549.

The determination of whether the successor is required to arbitrate depends upon the specific facts of each case. Howard Johnson Co. v. Detroit Local Joint Executive Board, 417 U.S. 249, 256 (1974). Critical to the determination is whether there is a "substantial continuity of identity in the business enterprise before and after a change." Wiley & Sons, Inc., 376 U.S. at 551. The Supreme Court's jurisprudence on the issue of successorship in the context of federal labor law and policy gives substance to this requirement.

In Wiley & Sons, Inc., the Supreme Court addressed whether a successor company was bound to arbitrate pursuant to a CBA between the union and the predecessor company. The predecessor merged with the defendant corporation and disappeared and the defendant corporation continued to conduct the same business. The court held that the "wholesale transfer of the predecessor employees," "the disappearance by merger of the [predecessor] corporate employer," and the fact that the successor was notified of the collective bargaining agreement, established successorship and the duty to arbitrate. Wiley & Sons, Inc., 376 U.S. at 551.

The Supreme Court came to an opposite conclusion in NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272 (1972), an

11

unfair labor practices suit, and, subsequently, in the context of another suit to compel arbitration, Howard Johnson, 417 U.S. at 249. In Burns, the Union argued that Burns, the employer, was bound by a CBA between Wackenhut, another employer, and the Union, because Burns had hired enough of Wackenhut's employees to require Burns to bargain with the Union. The Court distinguished Burns from Wiley & Sons in part because it was an unfair labor practices case, rather than one to compel arbitration. Additionally, there was no merger or transfer of assets from Wackenhut to Burns and Burns made it clear that it had no intention to be bound by the terms of the CBA between the Union and Wackenhut. Burns, 406 U.S. at 288. The Court held that, because Burns was not bound by the CBA between the Union and Wackenhut, it was not liable for an unfair labor practice premised on the CBA. Id. at 292.

The Howard Johnson Court, in a suit to compel arbitration, relied on NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272 (1972) to reach its conclusion that the new employer was not a successor and, therefore, was not required to arbitrate with the union after it had purchased all of the assets of a restaurant and motor lodge and leased the property from prior owners who had entered into a CBA with the union. Although brought as a suit to compel arbitration, the Court in Howard Johnson characterized it as an "effort to circumvent [the

Burns Court's] holding by asserting its claims in a § 301 suit to compel arbitration rather than in an unfair labor practice," Howard Johnson, 417 U.S. at 262, because the union sought to compel the new employer to hire all of the former employer's employees, Id. at 260. The Howard Johnson Court additionally distinguished itself from Wiley & Sons because the union still had a "realistic remedy" from Howard Johnson's predecessor, because the initial employer remained in existence, and the small number of the predecessor's employees hired by Howard Johnson: roughly seventeen percent of the successor's employees were those of the predecessor. The Court stated that substantial continuity of the business identity "necessarily includes, we think, a substantial continuity in the identity of the work force across the change in ownership." 417 U.S. at 263. The court, however, has not specifically defined what constitutes "workforce continuity" in the context of an obligation to arbitrate.

In Fall River Dyeing and Finishing Corp. v. NLRB, the Court approved of the National Labor Relations Board's approach for determining whether there is "substantial continuity" between employers and enumerated several factors to examine: whether the business of both employers is essentially the same, whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors, and

13

whether the new entity has the same production process, produces the same products, and basically has the same body of customers. 482 U.S. 27, 37-38 (1987) (finding successorship in the context of a successor employer's duty to bargain, rather than its duty to arbitrate). The Court approved of the Board's conclusion that the petitioner corporation was a successor. Id., 482 U.S. at 44. The successor acquired most of the predecessor's machinery and equipment, and much of its inventory and materials, and introduced no new product line. Id. "Of particular significance [was] the fact that, from the perspective of the employees, their jobs did not change." Id. The production process was the same, the job classifications were the same, employees worked on the same machines under the direction of supervisors, most of whom were former supervisors of the predecessor. Id. The fact that there was a seven-month hiatus between the demise of the old company and the start-up of the new and that the employees were hired through newspaper advertisements as opposed to the predecessor's employment records, was not determinative of the successorship question in light of the other factors indicating continuity. Id.

### C. Vertical's Successor Status

As the Supreme Court has repeatedly stated when deciding an issue of successorship in the labor context, whether Vertical is a successor to Industrial "turns to a great extent

14

on the precise facts involved." Burns, 406 U.S. at 274. In light of the facts as articulated by the parties and supported by the record, the court finds that "substantial continuity of identity in the business enterprise" is satisfied and Vertical is a successor to Industrial for the specific issue of whether Vertical is bound by Industrial's arbitration agreement with Local 1. The question of whether Vertical is bound by the additional terms of the joinder agreement and CBA is an issue for arbitration. Local 32B-32J Service Employees Int'l Union v. NLRB, 982 F.2d 845, 849 (2d Cir. 1993).

The undisputed facts supporting a finding that there is substantial continuity of identity between the Industrial and Vertical enterprises are as follows. Vertical retained the same operative name, PRO Elevator, and operated virtually the same business as Industrial. Vertical took over Industrial's contracts, continued to use the same telephone number and address, and only slightly changed its name, from Century Industrial Services, Inc. d/b/a PRO Elevator Services to Century Vertical Systems, Inc., d/b/a PRO Elevator. Currently, roughly seventy percent of Industrial's former customers are still serviced by Vertical. Additionally, Dorsey, who is the fifty-percent owner of Vertical, was previously a mechanic, supervisor, manager, and salesman at Industrial and a member of Local 1 who assisted Industrial with soliciting and building a

customer base and presenting and finalizing service contracts with customers. Mr. Dorsey was at least aware of the labor relations and percolating work stoppage between Local 1 and PRO Elevator Services in January 2006. Dorsey and Stork, the owners and principals of Vertical, understood that Local 1 represented Industrial's workers through a CBA. Dorsey and Stork did not purchase any assets of Industrial, but were essentially given PRO Elevator by the previous owner of Industrial, Mr. O'Connor. Furthermore, Vertical employees engaged in a similar production process as Industrial employees: they were supervised by Dorsey and used their own tools while working. Finally, unlike the union in Howard Johnson, Local 1 has no "realistic remedy" with the predecessor company.

The only factor weighing against the court's finding that there is "substantial continuity" of the enterprises is the identity of Vertical's workforce. Of the fourteen mechanics and apprentices employed by Vertical, at least four (Scott Dorsey, Tom Dorsey, James Drummond and John Drummond) are former Industrial employees. While the court acknowledges that this is far from the entire workforce, as was the case in Wiley, in light of the other factors considered by the Supreme Court in determining substantial continuity of identity, the court does not find this fact determinative. See, e.g., Monroe Sander Corp. v. Livingston, 377 F.2d 6, 12 (2d Cir. 1967). Indeed, as

16

the Supreme Court made clear in Burns, the composition of the successor's workforce is not dispositive. Instead, as the Second Circuit stated, "[t]he relevance of the successor's engaging its predecessor's employees . . . is to show similarity of operations." Id. at 12 (citing Wiley, 376 U.S. at 481).

Unlike the cases before the Supreme Court, the workers in the present action left Industrial in an effort to enforce their rights under the CBA. It was this work stoppage that prompted O'Connor to give up Industrial to Dorsey. Therefore, to the extent that the percentage of former Industrial employees employed by Vertical may be considered low, it is not a result of a lack of continuity between the two enterprises, or an effort by Rowan and Dorsey to distinguish Vertical from Industrial. Under these circumstances, it would be contrary to federal labor policy to give undue weight to the number of predecessor employees at a successor's business in the successorship analysis. Doing so would penalize workers for exercising their right to enforcement of a CBA and discourage such enforcement, thereby rendering a CBA virtually meaningless. The result would allow employers to escape responsibility from remedying the underlying causes of the work stoppage and severely limit employees' protection from a sudden change in an employment relationship.

While retention of a quarter of a predecessor's workforce might be insufficient to establish a basis for substantial continuity of the business enterprise absent the circumstances specific to this case and the above-highlighted indicia, given the particular facts of this case, the court is satisfied that the totality of factors is sufficient. Therefore, defendant's motion for summary judgment is granted.

### III. Conclusion

For the foregoing reasons the plaintiff's motion for summary judgment is denied.  The defendant's motion for summary judgment for an order compelling arbitration and dismissing the case is granted.


**SO ORDERED**
DATED: September 22, 2009

                                            /s/
                                 Kiyo A. Matsumoto
                                 United States District Judge